IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00273-MEH

SHAWN HARPER,

     Plaintiff,

v.

SHARON PHILLIPS,
in her individual and official capacities as a nurse practitioner,

     Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court is Defendant's Motion for Summary Judgment ("Motion") [filed September 4, 2015; docket #21]. The Court finds that oral argument will not assist in the adjudication of the Motion. For the reasons that follow, the Court **grants** the Motion.[1]

## BACKGROUND

### I.    Procedural History

Plaintiff initiated this lawsuit as a *pro se* litigant currently incarcerated at the Colorado State Penitentiary ("CSP"). Plaintiff filed his Complaint on February 9, 2015, *in forma pauperis*, against Defendant Sharon Phillips, in her individual and official capacities as a nurse practitioner, alleging a deprivation of his Constitutional rights pursuant to 42 U.S.C. § 1983. *See* docket #1. Magistrate Judge Gordon P. Gallagher reviewed the Complaint, found it sufficient, and had the case drawn to

---

[1]Pursuant to 28 U.S.C. § 636(c) and the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges, the parties consented to the jurisdiction of this Court to conduct all proceedings in this civil action. Dockets ##51-52.

a presiding judge on February 10, 2015 [*see* docket #5], at which time this Court was assigned the

case [docket #6].

On September 4, 2015, Defendant filed the current Motion.  Docket #21.  On October 8,

2015, having not received a response from Plaintiff, the Court issued a Minute Order informing

Plaintiff  as follows:

> Pursuant to D.C. Colo. LCivR 56.1(a), Plaintiff is reminded that he may file a written
> response to the Motion.  Because the Court has not previously instructed this *pro se*
> Plaintiff of his opportunity to respond, the Court will accept a late-filed written
> Response to the Motion on or before November 2, 2015.  Without a showing of
> exceptional cause, the Court will grant no extensions beyond this date.

Docket #22.

On October 12, 2015, Defendant filed a motion to vacate the upcoming final pretrial

conference, which was to be held November 2, 2015.  Docket #23.  The Court on October 13, 2015,

granted that motion, indicating the final pretrial conference would "be rescheduled, if necessary,

upon the Court's order ruling on the pending motion for summary judgment."  Docket #25.  Two

weeks later, on October 28, 2015, Plaintiff filed a "motion for continuance" and request for

appointment of free counsel.  Docket #27.  The Court denied without prejudice the request for

appointment of free counsel, as Plaintiff did not provide the Court "with information regarding the

factors for the Court to consider pursuant to D.C. Colo. LAttyR 15(f)(1)(B)."  Docket #29.

However, the Court granted Plaintiff's "motion for continuance" – which in effect was a request for

Plaintiff to have more time to file a response to Defendant's Motion – allowing him the ability to

file it "on or before November 23, 2015."  Docket #29.  Plaintiff also on October 28, 2015, filed

what he labeled a "letter."  Docket #28.  It appeared to be a proposed final pretrial order, which the

Court explained in its subsequent Minute Order was an unnecessary filing because the Court had

vacated the Final Pretrial Conference.  Docket #29.  Plaintiff also attached to his "letter" a variety of documents [*see* docket #28 at 6-18], which the Minute Order noted were improperly filed, because "any request for relief from this Court must be made in the form a motion" [docket #29].

Despite having been granted permission and two extensions to file a response, Plaintiff failed to do so.  No further communications have been made by Plaintiff to the Court as of the time of this Order.  Failure to file a response within the time specified results in a waiver of the right to respond or to controvert the facts asserted in the summary judgment motion.  *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).  Under these circumstances, a court accepts as true "all material facts asserted and properly supported in the summary judgment motion.  But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment."  *Id*.  Therefore, the Court here has accepted as true all properly supported facts provided by Defendant; however, given Plaintiff's *pro se* status, it has done so only after a liberal review of facts provided by Plaintiff in his Complaint [*see* docket #1], as well as in his "letter" and exhibits to that document [*see* docket #28].[2]

Plaintiff's suit asserts two claims against Defendant, both pursuant to 42 U.S.C. § 1983 for violations of his Eighth Amendment rights.  *See* docket #1 at 7-11.  "The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments on those convicted of crimes."  *Wilson v. Seiter*, 501

---

[2]Typically, in the summary judgment context, a *pro se* litigant's verified complaint may be treated as an affidavit so long as it satisfies the standards for affidavits outlined in Fed. R. Civ. P. 56.  *See Adams v. Dyer*, 223 F. App'x 757, 764 n.7 (10th Cir. 2007) (citing *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988)).  However, the Court's review of these materials lead to the conclusion that Plaintiff raises no genuine issues of material fact.  Defendant's Motion incorporates Plaintiff's facts, which the Court has included in its Findings of Fact below.  Yet Defendant's Motion then provides additional facts not countered in any way by Plaintiff.  Without a response filed and with nothing on which to counter Defendant's additional facts, the Court adopts them as true in consideration of this Motion.

U.S. 294, 296-97 (1991). The Eighth Amendment is the main source of prisoners' substantive rights and, regarding convicted prisoners, the legal standards under the Eighth and Fourteenth Amendments are generally congruous. *See Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (noting that where constitutional protection is afforded under specific constitutional provisions, here the Eighth Amendment, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of the Fourteenth Amendment). Thus, the Court reviews Plaintiff's claim under the Eighth Amendment as applicable to the states through the Fourteenth Amendment. *Riddle*, 83 F.3d at 1202.

In his first claim, Plaintiff alleges that on January 12, 2015, Defendant denied Plaintiff medical care for his chronic back pain, including his requests for pain medication, a back brace, and additional mattresses. Docket #1 at 7-10. In his second claim, Plaintiff alleges that Defendant discontinued his prescription for Bentyl, which had been prescribed to Plaintiff for treatment of his rectal prolapse. *Id*. at 11-13. Plaintiff also notes within claim two that Defendant discontinued his ability to receive the medication Excedrin. *Id*. at 11. Plaintiff seeks punitive damages in the amount of $1,500,000.00 against Defendant in her individual capacity. *Id*. at 15. He also seeks an order of injunction against Defendant in her official capacity, requiring Defendant to place Plaintiff "back on his medications," and to provide Plaintiff with pain medications, a back brace, and two mattresses for treatment of his back pain. *Id*.

## II.     Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to Plaintiff, who is the non-moving party regarding Defendant's Motion.

### A.     Plaintiff's Failure to Exhaust Administrative Remedies

4

1.      Anthony DeCesaro is the Step 3 Grievance Officer for the CDOC and is the custodian of records for Step 3 grievances.  *See* Affidavit of Anthony DeCesaro ("DeCesaro Aff."), docket #21-1 at ¶¶ 1- 2.

2.      The CDOC provides offenders with administrative remedies pursuant to a three-step grievance process set forth by Administrative Regulation ("AR") 850-04.  *Id*. at ¶ 3.

3.      AR 850-04 sets forth that offenders are required to first attempt to resolve any issue or complaint they have by filing a document known as a Step 1 grievance within 30 days of the discovery of the issue or complaint, to which an appropriate staff person for the CDOC responds in writing.  *Id*. at ¶ 4.

4.      If the offender is not satisfied with the result of the Step 1 grievance, he must then proceed to file another grievance form concerning the issue, known as a Step 2 grievance, within 5 days of receipt of the written response to the Step 1 grievance.  *Id*. at ¶ 5.

5.      If the offender is still unsatisfied with the response to his Step 2 grievance, he must then proceed to file a Step 3 grievance within 5 days of receipt of the written response to the Step 2 grievance.  *Id*. at ¶ 6.

6.      The Step 3 grievance is the final step in the CDOC grievance process.  *Id*. at ¶ 7.

7.      If an offender fails to timely file any grievance within the time periods provided by the grievance process, he has failed to comply with AR 850-04 or to exhaust his administrative remedies.  *Id*. at ¶ 8.

8.      With regard to Plaintiff's complaints regarding Defendant's alleged discontinuation of his prescription for Bentyl, Plaintiff did not exhaust his administrative remedies with respect to this claim because Plaintiff failed to submit his Step 3 grievance in accordance with the applicable time

frames provided in AR 850-04.  *Id*. at ¶ 16.

9.      With regard to Plaintiff's complaints regarding Defendant's alleged failure to provide him medical care on January 12, 2015, for treatment of his back pain, Plaintiff did not exhaust his administrative remedies with respect to this claim because he failed to file a Step 3 grievance.  *Id*. at ¶ 17.

### B.      Plaintiff's Prescription for Bentyl

10.     Plaintiff arrived at the CDOC in March of 2011 with a prescription for Bentyl (Dicyclomine), which Plaintiff had previously received while in county jail.   *See* Affidavit of Dr. Susan Tiona ("Tiona Aff."), docket #21-2 at ¶ 7; Affidavit of Sharon Phillips ("Def. Aff."), docket #21-3 at ¶ 8.

11.     Bentyl is an anti-cholinergic medication that relaxes the smooth muscles in the colon.  It is most commonly used to treat irritable bowel syndrome ("IBS"), but only the diarrhea predominant form of IBS.  *See* Tiona Aff. at ¶ 8; Def. Aff. at ¶ 9.

12.     Per CDOC policy, Plaintiff's prescription for Bentyl was continued until he could be evaluated by a health care provider for his intestinal/digestive complaints.  *See* Tiona Aff. at ¶ 9; Def. Aff. at ¶ 10.

13.     Plaintiff's prescription for Bentyl was renewed for 90 days upon his arrival to the CSP, and then again for an additional 90 days, because he had not yet seen a provider for this specific medical complaint.  *See* Tiona Aff. at ¶ 10; Def. Aff. at ¶ 11.

14.     Plaintiff bore the responsibility of contacting the facility medical clinic to request an appointment to be seen for his digestive condition, but he failed to do so until many months after his arrival to the CDOC.   *See* Tiona Aff. at ¶ 11; Def. Aff. at ¶ 12.

15.     Plaintiff's first mention of any specific intestinal complaint occurred on July 3, 2011, when

he was incarcerated in the Colorado Territorial Correctional Facility ("CTCF") infirmary recovering from a significant self-inflicted wound.  At that time, Plaintiff informed the provider that he had a history of rectal prolapse.   *See* Tiona Aff. at ¶ 12; Def. Aff. at ¶ 13.

16.     On August 9, 2011, Plaintiff's prescription for Bentyl was renewed for 180 days.  *See* Tiona Aff., docket #21-2 at ¶ 13; Def. Aff., docket #21-3 at ¶ 15.

17.     Plaintiff was seen by Dr. Hodge for intestinal complaints on January 19, 2012.  *See* Tiona Aff. at ¶ 14; Def. Aff. at ¶ 18.

18.     Dr. Hodge noted that "[Patient] also complains that some of his intestine (rectum) sometimes comes out with defection; thinks the Bentyl helps with this."  Dr. Hodge noted that Plaintiff's prescription for Bentyl would be renewed for now, though a period of bowel observation could be an option for determining the severity of Plaintiff's problems.  *See* Tiona Aff. at ¶ 14; Def. Aff. at ¶ 18.

19.     Plaintiff's prescription for Bentyl automatically expired in July of 2012.  *See* Tiona Aff. at ¶ 15; Def. Aff. at ¶ 19.

20.     Between July of 2012 and May of 2014, Plaintiff did not request a renewal of his prescription for Bentyl despite being seen on numerous occasions by medical and mental health providers, and despite seeking renewals of other prescribed medications.  *See* Tiona Aff. at ¶ 16; Def. Aff. at ¶ 20.

21.     On June 2, 2014, Plaintiff was admitted to the CTCF infirmary for surgical convalescence following surgical repair of his rectal prolapse.  If Plaintiff had been requesting Bentyl for treatment bowel spasms associated with his rectal prolapse, this corrective surgery would have eliminated that need.  *See* Tiona Aff. at ¶ 18; Def. Aff. at ¶ 26.

22.     Two days after surgery, Plaintiff reported to the infirmary provider that he was experiencing "a lot of cramping," and Bentyl was ordered for 10 days to help with this complaint.  *See* Tiona Aff.

at ¶ 19; Def. Aff. at ¶ 27.

23.     Plaintiff was discharged from the infirmary and transferred to the San Carlos Correctional Facility ("SCCF") on June 12, 2014.  *See* Tiona Aff. at ¶ 20; Def. Aff. at ¶ 29.

24.     Upon Plaintiff's arrival to the SCCF, Defendant, per standard procedure, conducted a chart review of Plaintiff's medical history.  Plaintiff's medical records demonstrate that no changes were made to his medication protocol with the exception of a prescription for Tylenol 3, which was discontinued because of Plaintiff's documented allergy to Codeine.  *See* Tiona Aff. at ¶ 21; Def. Aff. at ¶ 31.

25.     On June 14, 2014, Plaintiff's 10-day Bentyl prescription (which was ordered for treatment of transient post-operative cramping) expired automatically.  *See* Tiona Aff. at ¶ 22; Def. Aff. at ¶ 32.

26.     Plaintiff did not request a renewal of this medication following its automatic expiration, nor would a renewal have been appropriate as Plaintiff was not complaining of any stomach pain or discomfort.  *See* Tiona Aff. at ¶ 22; Def. Aff. at ¶ 32.

27.     Defendant did not discontinue Plaintiff's prescription for Bentyl.  The prescription, which was issued for a 10-day period of time, expired automatically.  Further, there was no medical indication for Defendant to restart the Bentyl as Plaintiff did not request a renewal of the medication nor did he complain of any stomach pain while incarcerated in the SCCF.  *See* Tiona Aff. at ¶ 23; Def. Aff. at ¶ 58.

28.     It is Dr. Tiona's expert opinion that the medical care rendered by Defendant to Plaintiff with respect to Plaintiff's rectal prolapse was appropriate, timely, and met medical standards of care.  *See* Tiona Aff. at ¶ 24.

### C.     Plaintiff's Prescription for Excedrin

29.     Upon his arrival to the CDOC, Plaintiff reported a very lengthy and extensive history of substance abuse problems.  *See* Tiona Aff. at ¶ 26; Def. Aff. at ¶ 5.

30.     Plaintiff's abuse of substances continued during his incarceration in the CDOC with Plaintiff frequently abusing and misusing his prescription medications.  *See* Tiona Aff. at ¶ 26; Def. Aff. at ¶ 59.

31.     Within weeks of arriving to the CDOC, on March 21, 2011, Plaintiff was discovered abusing his prescription for Wellbutrin.  *See* Tiona Aff. at ¶ 27; Def. Aff. at ¶ 6.

32.     Less than a month later, on or about April 14, 2011, security staff reported that they discovered a second cup in Plaintiff's cell that he was using to feign taking his medication.  Security staff conducted a shakedown of Plaintiff's cell, where it was suspected that Plaintiff flushed several pills down his toilet.  *See* Tiona Aff. at ¶ 28; Def. Aff. at ¶ 7.

33.     On December 20, 2011, Plaintiff was again documented misusing and/or hoarding medications.  The incident was reported to mental health staff and Plaintiff's mental health provider discontinued his psychiatric medications because of his continued abuse of the medications.  *See* Tiona Aff. at ¶ 29; Def. Aff. at ¶ 16.

34.     Plaintiff's psychiatric medication was renewed following subsequent consultations with mental health wherein Plaintiff acknowledged his behavior and demonstrated a willingness to follow medical instructions with respect to the use of prescribed medications.  *See* Tiona Aff. at ¶ 30.

35.     On February 17, 2013, Plaintiff was discovered taking medications not prescribed to him. *See* Tiona Aff. at ¶ 31; Def. Aff. at ¶ 21.

36.     On January 3, 2014, Plaintiff was seen for a complaint of headaches.  Plaintiff reported that he had been getting headaches for the last one to two months, but he denied a previous history of headaches.  *See* Tiona Aff. at ¶ 32; Def. Aff. at ¶ 22.

37.     Plaintiff was prescribed Excedrin for treatment of his headaches and was provided a supply of 30 tablets per month for self-administering with instructions to take two tablets every six hours, not to exceed eight tablets in a 24-hour period, and not to take for a duration of longer than 48 hours. *See* Tiona Aff. at ¶ 32; Def. Aff. at ¶ 22.

38.     The prescription was issued for a four month period of time. *See* Ambulatory Health Record ("AHR"), January 3, 2014, docket #21-3 at 27.

39.     Shortly after receiving this prescription, on February 11, 2014, Plaintiff submitted a kite complaining about the prescribed amount of Excedrin provided. The provider explained to Plaintiff that the limit was set by the pharmacy. The provider also issued Plaintiff an additional prescription for Tylenol.  *See* Tiona Aff. at ¶ 33; Def. Aff. at ¶ 23; *see also* AHR, February 11, 2014, docket #21-3 at 28.

40.     On April 1, 2014, Plaintiff submitted a kite for additional Excedrin.  Plaintiff requested that his prescription be doubled as he reported using a 30-day supply of medication within two weeks. *See* Tiona Aff. at ¶ 34; Def. Aff. at ¶ 24; *see also* AHR, April 1, 2014, docket #21-3 at 29.

41.     Several days later, on April 8, 2014, Plaintiff was counseled about his abuse of medications and caffeine, an ingredient present in Excedrin. The provider discussed with Plaintiff his addictive behavior and his use of caffeine to get high. Plaintiff was counseled as to the potential medical risks of abusing caffeine-related products and medications. *See* Tiona Aff. at ¶ 35; Def. Aff. at ¶ 25; *see also* AHR, April 8, 2014, docket #21-3 at 30.

42.     On June 9, 2014, a provider noted that Plaintiff's use of Excedrin exceeded the recommended usage of the medication. Later that same day, another provider noted that Plaintiff was seeking additional Excedrin beyond his prescribed dosage. *See* AHR, June 9, 2014, docket #21-3 at 33-34; *see also* Tiona Aff. at ¶ 36;

10

43.     Plaintiff was transferred to the SCCF on June 12, 2014, wherein Defendant conducted a chart review of Plaintiff's medical file.  Defendant did not make any changes to Plaintiff's prescription for Excedrin.  *See* Tiona Aff. at ¶ 21; Def. Aff. at ¶ 31; *see also* AHR, June 12, 2014, docket #21-3 at 35.

44.     On June 22, 2014, Plaintiff requested that he be provided Excedrin.  *See* AHR, June 22, 2014, docket #21-3 at 36.  Though Plaintiff was provided a supply of Excedrin with a recommended dosage protocol, Plaintiff exceeded the dosage protocol and utilized the remainder of his medication before the allowable renewal date for the same.  *See* Tiona Aff. at ¶ 38; Def. Aff. at ¶ 33.

45.     Plaintiff became extremely upset with medical staff and tried to insist that he be provided with a back stock of Excedrin.  *See* AHR, June 25, 2014, docket #21-3 at 37.

46.     Defendant was alerted to Plaintiff's misuse of his prescription for Excedrin, and on June 25, 2014, in accordance with Department policy and clinical standards, Defendant discontinued the medication and offered Plaintiff alternative measures for pain management, to include Motrin or Tylenol, which Plaintiff refused.  *See* Tiona Aff. at ¶¶ 38-39; Def. Aff. at ¶¶ 33-34; *see also* AHR, June 26, 2014, docket #21-3 at 38-42.

47.     The discontinuation of Excedrin was medically indicated as Plaintiff's medical records demonstrated that since receiving a prescription for Excedrin six months earlier, Plaintiff had frequently abused the medication by exceeding the dosage protocol and consuming excess medication in contradiction of prescription guidelines.  *See* Tiona Aff. at ¶ 39; Def. Aff. at ¶ 35.

48.     The CDOC had a zero-tolerance policy for abuse of medication by offenders, a policy about which Plaintiff has been counseled.  *See* Tiona Aff. at ¶ 39; Def. Aff. at ¶ 35.

49.     In addition to misusing Excedrin, Plaintiff also exhibited inappropriate behavior and verbal aggression with nursing staff when demands for additional Excedrin were not met.  *See* Tiona Aff.

at ¶ 40; Def. Aff. at ¶ 36; *see also* AHR, June 26, 2014, docket #21-3 at 37.

50.     Given Plaintiff's frequent misuse of the Excedrin and his inappropriate behavior towards nursing staff with respect to this medication, it is Dr. Tiona's expert opinion that it was medically indicated and appropriate for Defendant to discontinue Plaintiff's prescription for Excedrin. *See* Tiona Aff. at ¶ 41.

51.     Defendant reissued Plaintiff's prescription for Excedrin on November 24, 2014, following Plaintiff's acknowledgment of his prior misuse of the medication, and his willingness to follow prescription guidelines with respect to use of prescribed medications. *See* Tiona Aff. at ¶ 42; Def. Aff. at ¶ 43.

52.     However, Plaintiff's misuse of Excedrin resumed in January of 2015 when he sought additional medication in excess of the prescription guidelines. Plaintiff was informed by a medical provider that because of the nature of the medication, Plaintiff would not be provided with additional Excedrin. Plaintiff was offered alternate medications for pain management, which Plaintiff refused. *See* Tiona Aff. at ¶ 43; Def. Aff. at ¶ 50; *see also* AHR, January 20, 2015, docket #21-3 at 50.

53.     Upon learning he would not be provided with additional Excedrin, Plaintiff became agitated and argumentative with staff. Plaintiff's behavior than escalated when he purposefully covered his cell window and barricaded himself under his bed in an attempt to prevent staff from monitoring his movements. Plaintiff was instructed several times to come to the door and cuff up, orders which Plaintiff disregarded. *See* Tiona Aff. at ¶ 43-44; Def. Aff. at ¶ 50-51.

54.     Because of Plaintiff's nonresponsive and noncompliant behavior, staff was forced to physically enter Plaintiff's cell in order to gain his compliance. Plaintiff then became physically violent with staff, including kicking his legs aggressively at staff members. *See* Tiona Aff. at ¶ 44; Def. Aff. at ¶ 51.

55.     On January 18, 2015, Plaintiff was removed from population due to his misconduct.   During a pack-out of Plaintiff's property, a pill was found hidden in his cell.   *See* Tiona Aff. at ¶ 45; Def. Aff. at ¶ 53.

56.     Plaintiff's aggressive and hostile behavior towards staff continued after his removal from population.   On January 20, 2015, Plaintiff again requested that he receive additional Excedrin in excess of prescription guidelines.   *See* Tiona Aff. at ¶ 46; Def. Aff. at ¶ 54; *see also* AHR, January 20, 2015, docket #21-3 at 50.

57.     Plaintiff was informed that he would not be provided additional Excedrin, and he was offered Tylenol instead.   Plaintiff refused the alternate medication and proceeded to cover his cell window to prevent staff from observing his movements.   *See* Tiona Aff. at ¶ 46; Def. Aff. at ¶ 54.

58.     Plaintiff then broke a sprinkler nozzle and flooded his cell and surrounding areas with water and feces.   Plaintiff actions continued throughout the day with him continuing to defile the area with his excrement.   *See* Tiona Aff. at ¶ 46; Def. Aff. at ¶ 54; *see also* AHR, January 20, 2015, docket #21-3 at 51.

59.     On January 20, 2015, Defendant discontinued Plaintiff's prescription for Excedrin because of his violent behavior toward staff and his continued overuse of the medication.   Plaintiff was provided Tylenol in its place.   *See* Tiona Aff. at ¶ 47; Def. Aff. at ¶ 55; *see also* AHR, January 20, 2015, docket #21-3 at 51.

60.     It is Dr. Tiona's expert opinion that Defendant's actions in discontinuing Plaintiff's prescription for Excedrin were appropriate and medically indicated.   *See* Tiona Aff. at ¶ 48.

61.     Defendant's decision was appropriate because the CDOC has a zero-tolerance policy with respect to offenders abusing prescribed medications, and Plaintiff was abusing his prescription for Excedrin and exhibiting aggressive behavior toward staff with respect to this medication.

Defendant's actions were also medically indicated as Plaintiff was documented as continually overusing this medication by exceeding the dosage protocol and by consuming excess medication in contradiction of prescription guidelines. *Id*.

62.    It is Dr. Tiona's expert opinion that the medical care rendered by Defendant to Plaintiff with respect to his prescription for Excedrin was appropriate, timely, and met medical standards of care. *Id*. at ¶ 49.

### D.    Plaintiff's Complaint of Back Pain

63.    Plaintiff had a lumbar laminectomy (back surgery usually done to correct a herniated disk) in 1991, a procedure that was revised in 1996 or 1997.  However, the events and exact pathology leading up to these two surgeries is not documented.  *See* Tiona Aff. at ¶ 50; Def. Aff. at ¶ 45.

64.    Plaintiff's medical records show that he was instructed on proper back care (stretching and strengthening exercises), and that he was prescribed over the course of time several different medications for control of his back pain.  *See* Tiona Aff. at  ¶ 51.

65.    It is Dr. Tiona's expert opinion that Plaintiff's medical records support a conservative treatment plan for care of Plaintiff's back pain complaints.  *Id*.

66.    On January 12, 2015, Defendant saw Plaintiff in clinic for his complaints of lower back pain. *See* Tiona Aff. at ¶ 52; Def. Aff. at ¶ 45; *see also* AHR, January 12, 2015, docket #21-3 at 47.

67.    During the consult, Plaintiff reported that he was doing back strengthening exercises in his cell, including stretching and pilates, but that the techniques were no longer effective in managing his back pain.  Plaintiff requested a consult to orthopedics.  *See* Tiona Aff. at ¶ 52; Def. Aff. at ¶ 48.

68.    At the time of the encounter, Plaintiff was receiving both Neurontin and Tylenol for pain management.  *See* Tiona Aff. at ¶ 53; Def. Aff. at ¶ 47;

69.    Defendant conducted a physical examination of Plaintiff, and noted that Plaintiff ambulated

without difficulty and maneuvered on and off the exam table easily.  Defendant noted that Plaintiff demonstrated tenderness of the sacroiliac joint and a positive straight let raise with the left leg, which could have indicated a pinched nerve.  *See* Tiona Aff. at ¶ 54; Def. Aff. at ¶ 46; *see also* AHR, January 12, 2015, docket #21-3 at 47.

70.     As a follow-up measure, Defendant ordered a non-emergent x-ray of Plaintiff's lower back to determine if any significant changes had occurred since Plaintiff's previous X-ray in October of 2011.  Defendant also renewed Plaintiff's prescription for Tylenol, which was set to expire.  *See* Tiona Aff. at ¶ 55; *see also* AHR, January 12, 2015, docket #21-3 at 47.

71.     During his encounter with Defendant on January 12, 2015, Plaintiff made no requests for additional pain medication, a back brace or extra mattresses.  *See* Tiona Aff. at ¶ 59; Def. Aff. at ¶ 62; *see also* AHR, January 12, 2015, docket #21-3 at 47.

72.     However, even if Plaintiff had made such requests, it is Dr. Tiona's expert opinion that such measures were not medically necessary given Plaintiff's current course of care and the provider's objective evaluation and assessment of Plaintiff.  *See* Tiona Aff. at ¶ 60.

73.     With respect to Plaintiff's claims regarding pain medications, at the time of the encounter, Plaintiff was receiving medications for management of his back pain, including Neurontin and Tylenol.  Based on Dr. Tiona's expert opinion, there was no medical indication that Plaintiff required additional pain medications in excess of those that were already prescribed.  *See* Tiona Aff. at ¶ 61.

74.     With respect to Plaintiff's claims concerning additional mattresses and a back brace, it is Dr. Tiona's expert opinion that these measures are not medically necessary for the treatment of back pain and were not medically indicated for treatment of Plaintiff's complaints of back pain.  *See* Tiona Aff. at ¶ 62.

75.     Based on a study performed by the United States Preventive Services Task Force, a panel of experts found that certain medical interventions, to include additional mattress and back braces, offer no clear proof of benefit to those patients utilizing such methods.  *See* Tiona Aff. at ¶ 62; Def. Aff. at ¶ 62.

76.     In keeping with this study, the CDOC has determined that certain preventative measures such as extra mattresses and back braces, which have not been found to be of any discernible benefit, will not be supplied by facility clinics or any CDOC health care provider.  *See* AR 700-34-IV-B-3; *see also* Tiona Aff. at ¶ 63; Def. Aff. at ¶ 62.

77.     While exceptions to this policy may be made in rare circumstances where there is a strong indication for such use, it is Dr. Tiona's expert opinion that Plaintiff's condition would not have necessitated deviation from the CDOC's stance on the medical benefit offered by these particular interventions.  *See* Tiona Aff. at ¶ 63; Def. Aff. at ¶ 62.

78.     Following the January 12, 2015 consultation, Plaintiff was scheduled for an X-ray appointment; however, two days before his scheduled appointment, Plaintiff engaged in physically violent behavior towards staff.  *See* Tiona Aff. at ¶ 56; Def. Aff. at ¶ 51; *see also* AHR, January 20, 2015, docket #21-3 at 51.

79.     During his physical altercation with staff, Plaintiff demonstrated extensive use of his back and legs, with full range of motion.  *See* Def. Aff. at ¶ 52.

80.     Two days later, on the day of his scheduled appointment, Plaintiff broke a sprinkler nozzle and flooded his cell and the surrounding areas with water and feces.  Plaintiff's actions lasted throughout the day with him continuing to defile the area with his excrement.  *See* Tiona Aff. at ¶ 56; Def. Aff. at ¶ 54.

81.     Given Plaintiff's violent and aggressive behavior, Defendant determined that it was not safe

for staff to transport Plaintiff for a non-essential X-ray, and the appointment was cancelled. *See* Tiona Aff. at ¶ 56; Def. Aff. at ¶ 56; *see also* AHR, January 20, 2015, docket #21-3 at 51.

82.     It is Dr. Tiona's expert opinion that Defendant's decision to cancel a non-urgent appointment was appropriate because Plaintiff's volatile and aggressive behavior created a serious safety and security risk with the transport of this particular offender outside of the prison setting. *See* Tiona Aff. at ¶ 56.

83.     Plaintiff made no further complaints of back pain while incarcerated at the SCCF, and he was transferred to the Colorado State Penitentiary on February 24, 2015, at which point Defendant no longer provided medical care or treatment to Plaintiff. *See* Tiona Aff. at ¶ 57; Def. Aff. at ¶ 57.

84.     It is Dr. Tiona's expert opinion that the care provided by Defendant to Plaintiff in regard to his complaints of back pain was appropriate, timely and consistent with medical standards of care. *See* Tiona Aff. at ¶ 58.

## LEGAL STANDARDS

### I.     Treatment of a *Pro Se* Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers.  [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted).  The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, this interpretation is qualified in that it is not "the

proper function of the district court to assume the role of advocate for the *pro se* litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

## II.    Dismissal under Fed. R. Civ. P. 56

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Defendant first raises the affirmative defense that Plaintiff failed to properly exhaust his administrative remedies. Docket #21 at 16. The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. PLRA, 42 U.S.C. § 1997e(a) (2013); *see also Booth v. Churner,* 532 U.S. 731, 733 (2001). The administrative remedies provision of the PLRA states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

§ 42 U.S.C. 1997e(a). At one time, exhaustion was left to the discretion of the district court; however, it has since become mandatory. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). "Prisoners

must now exhaust all 'available' remedies, not just those that meet federal standards." *Id.* "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones v. Bock*, 549 U.S. 199, 204 (2007).   The purpose of proper exhaustion is to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record. *Id.* (quoting *Woodford*, 548 U.S. at 94-95).

Accordingly, the Supreme Court has determined "exhaustion is mandatory under the PLRA" and "unexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 204.   The exhaustion of administrative remedies need not be pleaded in the complaint but must be raised as an affirmative defense. *Id.*   The rules governing the process for fulfilling the administrative remedy obligation are not articulated by the PLRA but are defined by the respective prison grievance process. *Id*. at 205. In order to "properly exhaust" in satisfaction of the PLRA requirement, the plaintiff prisoner must comply with all prison grievance procedures. *Id*.; *see also Woodford*, 548 U.S. at 90-91 (finding that the PLRA exhaustion requirement "demands compliance with an agency's deadlines and other critical procedural rules").   Therefore, according to *Jones*, claims that have not progressed through the prison grievance process may not be brought in court.

The CDOC maintains a written grievance procedure that includes three levels of appeal for its inmates. A.R. 850-04.[3] CDOC Administrative Regulation, Docket #21-1 at 6-17.   Offenders are required to first attempt to resolve any issue or complaint they have by filing a document known as a Step 1 grievance within 30 days of the discovery of the issue or complaint, to which an appropriate staff person for the CDOC responds in writing. *Id*. at 13.   If the offender is not satisfied with the

---

[3]The complete regulation is available on the CDOC's website, www.colorado.gov/cdoc/.

result of the Step 1 grievance, he must then proceed to file another grievance form concerning the issue, known as a Step 2 grievance, within 5 days of receipt of the written response to the Step 1 grievance. *Id.* If the offender is still unsatisfied with the response to his Step 2 grievance, he must then proceed to file a Step 3 grievance within 5 days of receipt of the written response to the Step 2 grievance. *Id.* The Step 3 grievance is the final step in the CDOC grievance process. *Id.*

If an offender fails to timely file any grievance within the time periods provided by the grievance process, he has failed to comply with AR 850-04 or to exhaust his administrative remedies. *Id.* Further, the PLRA mandates that a plaintiff must exhaust his administrative remedies before filing the action; if matters remain pending in the prison's grievance system at the time the lawsuit is filed, the prisoner has failed to comply with § 1997e(a). *See Price v. Shinn*, 178 Fed. App'x 803, 805 (10th Cir. April 28, 2006), citing *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1203, 1212 (10th Cir. 2003) ("[r]esort to a prison grievance process must precede resort to a court) (additional citations omitted). A prisoner does not exhaust his administrative remedies when he fails to properly complete the grievance process or correct deficiencies in his grievances before filing a lawsuit. *See Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). "An inmate who begins the grievance process but does not complete it is barred from pursuing a Section 1983 claim under the PLRA for failure to exhaust his administrative remedies." *Id.* Only if the prisoner has exhausted all administrative remedies may he or she then file a suit in federal court. *Jones*, 549 U.S. at 204.

Here, Plaintiff does not address in his Complaint, or any other documents provided to the Court, his failure to exhaust administrative remedies. However, Defendant's Motion provides evidence to demonstrate Plaintiff failed to exhaust his administrative remedies. *See generally* docket #21. Specifically, with respect to Plaintiff's claim about the alleged discontinuation of his prescription for Bentyl, Defendant shows that Plaintiff failed to submit his Step 3 grievance in

accordance with the applicable time frames provided in AR 850-04.  Docket #21-1 at 26-27.

Plaintiff filed a Step 3 grievance on August 25, 2014, but it was required to be filed by August 20,

2014.  *Id.*  Prison officials informed Plaintiff via letter dated September 19, 2014, that he had failed

to exhaust his administrative remedies with regard to the discontinuation of Bentyl.  *Id.* at 27.

Within Defendant's claim about being denied Bentyl, Defendant mentions in passing that he was

also denied Excedrin for his headaches.  Docket #21 at 11.  However, Plaintiff did not file

grievances regarding not being provided Excedrin, let alone exhaust his administrative remedies.

*See generally* docket #21-1 at 1-4.

 With regard to Plaintiff's claim regarding Defendant's alleged failure to provide him medical

care on January 12, 2015, for treatment of his back pain, Defendant provides evidence to show that

Plaintiff did not exhaust his administrative remedies  because he failed to file a Step 3 grievance at

all.  *See* docket #21-1 at 4.  In fact, Defendant asserts and the Court agrees that the very timing of

the filing of this lawsuit demonstrates Plaintiff could not have completed the required prison

grievance program.  *See* docket #21 at 17-18.  Plaintiff's Complaint indicates that the alleged

violation of Defendant not taking care of his back pain occurred on January 12, 2015 [*see* docket

#1 at 4]; Plaintiff filed this lawsuit less than three weeks later [*see* docket #1], leaving him

insufficient time to exhaust administrative remedies.

 The Court thus concludes that Plaintiff's case is barred based on his failure to exhaust

administrative remedies as required by law before bringing a lawsuit of this nature.

## CONCLUSION

 Therefore, based on the foregoing and the entire record herein, this Court **orders** that

Defendant's Motion for Summary Judgment [filed September 4, 2015; docket #21] is **granted** and

the case is **dismissed with prejudice**.

Entered and dated at Denver, Colorado, this 4th day of January, 2016.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge